## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

NEWARK EDUCATION WORKERS )
CAUCUS and NATURAL RESOURCES )
DEFENSE COUNCIL, INC., )
                                 )
        Plaintiffs, )
                                 )
    v. )
                                 )    Civ. No. 18-CV-11025
CITY OF NEWARK, RAS BARAKA, in )
his official capacity as Mayor of the City of )
Newark, NEWARK DEPARTMENT OF )
WATER AND SEWER UTILITIES, )
ANDREA HALL ADEBOWALE, in her )
official capacity as Director of the Newark )
Department of Water and Sewer Utilities, )
and CATHERINE R. McCABE, in her )
official capacity as Commissioner of the )
New Jersey Department of Environmental )
Protection, )
                                 )
        Defendants. )
                                 )

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

**INTRODUCTION**

1.      The tap water at many locations across Newark, New Jersey (Newark or City) contains dangerously high levels of lead, a powerful toxin that is devastating to the human body. Young children are especially vulnerable to lead exposure.

2.      Defendants have failed to comply with the federal law that requires water systems to deliver safe drinking water to the public. The Safe Drinking Water Act (the Act) and its implementing regulations, the Lead and Copper Rule, require officials who own or operate water systems to test drinking water for harmful contaminants and to treat the water to control for those contaminants. The law also requires states to set and approve certain standards that water systems must meet. Defendants' disregard for these requirements has exposed, and continues to expose, the people of Newark to high levels of lead in their drinking water.

3.      Newark residents began raising concerns about lead in their drinking water over two years ago. In the spring of 2016, thirty Newark public schools were found to have elevated levels of lead in their water fountains, water coolers, bathroom faucets, and other water sources. Those schools were subsequently disconnected from the City's water supply. The schools eventually reconnected to City water after committing to replace equipment and install filters at certain water sources. Despite these commitments, the school system's most recent reporting shows that lead levels in some of Newark's public schools remain elevated at accessible, non-decommissioned water fountains in certain school buildings.

4.      In 2016, Newark Mayor Baraka publicly assured residents that the lead in drinking water was not a City-wide problem. However, drinking water samples now show

that the high levels of lead in drinking water extend beyond the City's public schools to the homes and workplaces of Newark's residents.

5.      In July 2016, the New Jersey Department of Environmental Protection (NJDEP) notified the City of Newark that it was required to sample its drinking water for lead on a more frequent basis. Beginning in January 2017, NJDEP required Newark to take at least 100 drinking water samples every six months, in accordance with the Lead and Copper Rule.

6.      In 2017, the City of Newark sampled for lead in drinking water during two six-month monitoring periods. The first six-month monitoring period lasted from January 1 to June 30, 2017. The second six-month monitoring period lasted from July 1 to December 31, 2017. During both monitoring periods, the City's water system (Water System) exceeded the 15 parts per billion federal action level for lead set by the U.S Environmental Protection Agency (EPA). Throughout 2017, more than 10 percent of drinking water samples taken by the City exceeded 26.7 parts per billion.

7.      The City was required to continue this sampling schedule in 2018. Samples taken during the first monitoring period of 2018 have continued to show very high levels of lead in the City's drinking water, with one sample from May 2018 reaching 182 parts per billion. As of the date of filing, over 10 percent of samples taken during the first monitoring period of 2018 exceeded the 15 parts per billion action level.

8.      Throughout this lead crisis, the City of Newark has encouraged its residents to drink Newark's water. In April 2018, it told residents that "our water is safe to drink" and that "our water is some of the safest water in New Jersey." The City also denied the scope

of the problem, stating that the lead contamination is "confined to a limited number of homes with lead service lines."

9. In fact, the City does not know the scope of the problem because it has failed to identify which service lines contain lead, and has failed to properly monitor lead levels at Newark residents' taps. It has also failed to install and maintain the corrosion control treatment necessary to prevent the water from corroding service lines and lead plumbing, and leaching lead into residents' drinking water. All of these actions are required by federal law.

10. The EPA, Centers for Disease Control and Prevention, World Health Organization, and American Academy of Pediatrics all agree that there is no identified safe level of lead exposure.

11. The elevated levels of lead in Newark's drinking water threaten the health of the City's residents. Newark's young children and pregnant women are most vulnerable to the effects of the City's lead contamination.

12. These harmful effects of lead exposure in Newark will not be addressed until government officials properly treat Newark's water to control corrosion of lead pipes, set and comply with water quality parameters, follow required procedures to account for materials within the water-distribution system and complete robust sampling, educate the public about the high lead levels and the steps residents should take to protect themselves, replace lead service lines within the City, and take other steps to comply with the Safe Drinking Water Act and the Lead and Copper Rule.

13. Plaintiffs are citizens' groups whose members teach in Newark's public schools, live in homes served by Newark's water system, and/or go to school in Newark.

Plaintiffs bring this suit on behalf of their members who are residents and who go to school in Newark, to ensure that the water they drink in Newark will no longer threaten their health and their families' health, and to address the serious medical and health risks they face due to Defendants' conduct. Plaintiffs bring this suit on behalf of their members who are public school teachers to stop themselves and their students from being exposed to dangerous levels of lead and to alleviate the challenges and stress that accompany teaching children suffering from lead exposure.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to the Safe Drinking Water Act, 42 U.S.C. § 300j-8(a), and the federal-question jurisdiction statute, 28 U.S.C. § 1331. The Court may award Plaintiffs all necessary injunctive relief pursuant to the Safe Drinking Water Act, 42 U.S.C. § 300j-8(a), (e), and declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

15.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district, in Newark, New Jersey.

16.     Plaintiffs have provided Defendants, the Administrator of the EPA, and the New Jersey Attorney General with at least sixty days' written notice of the violations of law alleged here in the form and manner required by the Safe Drinking Water Act. 42 U.S.C. § 300j-8(b); 40 C.F.R. §§ 135.11–135.13. A copy of Plaintiffs' April 24, 2018, notice letter is attached as Exhibit A to this Complaint.

## THE PARTIES

17.     Plaintiffs are two organizations: Newark Education Workers Caucus (NEW Caucus) and Natural Resources Defense Council, Inc. (NRDC).

18.     Plaintiff NEW Caucus is an association of educators who teach in Newark public schools and, in some cases, live in Newark. NEW Caucus's mission is to unify Newark's educators in support of social justice initiatives in Newark, both for educators as well as for their students and students' families. NEW Caucus has five steering committee members and over thirty general members.

19.     Plaintiff NRDC is an international, nonprofit environmental organization. NRDC engages in research, advocacy, and litigation to protect public health and reduce the exposure of all communities to toxic substances. NRDC's work includes advocacy aimed at ensuring that communities across the country have access to safe and affordable drinking water that is free from dangerous contaminants. Founded in 1970, NRDC has more than 400,000 members nationwide, including more than 12,000 members who reside in New Jersey, and over 30 who live in Newark. NRDC is incorporated under the laws of New York and is headquartered at 40 West 20th Street, New York, New York 10011.

20.     NEW Caucus and NRDC bring this action on behalf of their members. Members of these organizations live, go to school, and teach in Newark, where homes and schools are served by the Water System. These members and their families live, work, purchase and consume food and drink, recreate, attend church, and go to school in buildings that receive Newark's water.

21.     Members of NEW Caucus and NRDC are harmed, and will continue to be harmed, by Defendants' violations of the Safe Drinking Water Act unless this Court grants

the requested relief. These members are harmed, and will continue to be harmed, because they have an increased risk of exposure to elevated levels of lead in drinking water. Members of NEW Caucus suffer from additional harm because their jobs as educators are made more difficult by the increased incidence of behavioral and developmental health problems associated with childhood lead exposure.

22.     Elevated levels of lead have been found in drinking water in homes and schools throughout Newark. Members of NEW Caucus and NRDC are reasonably fearful of exposure to lead from their drinking water. They are concerned about their health and the health of their children, including potential long-term developmental problems.

23.     Because of these members' reasonable concerns about lead exposure, many of them use bottled or filtered water at school and in their homes to minimize their risk. NEW Caucus teachers are particularly concerned about whether their students have access to bottled or filtered water. Members of these organizations would prefer to use unfiltered tap water that they purchase from the Water System, rather than having to incur additional costs and inconvenience to use bottled or filtered water. Some members who live in Newark have installed filters in their homes. However, water filtration systems are expensive. If not used, replaced, and maintained regularly and properly, the filters will stop working.

24.     Members of NEW Caucus and NRDC are harmed because of these and other actions they are taking on behalf of themselves, their students, and their families to counteract the risks posed by Newark's water. Their injuries will be redressed by an order requiring Defendants to comply with the Safe Drinking Water Act. Such an order will enable members to make informed decisions about whether their tap water is safe to drink

and will remediate the dangerous conditions and health risks that they are exposed to as a result of Defendants' continued non-compliance.

25.　　Defendant City of Newark is an owner and an operator of a "public water system" as defined by the Safe Drinking Water Act. 42 U.S.C. § 300f(4); 40 C.F.R. § 141.2. A public water system is a system that provides drinking water through pipes to at least twenty-five people, and includes water collection, treatment, storage, and distribution facilities. 42 U.S.C. § 300f(4); 40 C.F.R. § 141.2. As an owner and operator of a public water system, the City is also a "supplier of water." 42 U.S.C. § 300f(5); 40 C.F.R. § 141.2. The City of Newark's water system is a large system because it serves more than 50,000 people. 40 C.F.R. §§ 141.2, 141.81(a)(1).

26.　　Defendant Newark Department of Water and Sewer Utilities is an owner and an operator of a "public water system" as defined by the Safe Drinking Water Act. 42 U.S.C. § 300f(4); 40 C.F.R. § 141.2. As an owner and operator of a public water system, the Department of Water and Sewer Utilities is also a "supplier of water." 42 U.S.C. § 300f(5); 40 C.F.R. § 141.2.

27.　　Defendant Ras Baraka is sued in his official capacity as the Mayor of Newark. He directs and supervises the day-to-day operations of the City, including the operations of the Water System. Defendant Baraka is an operator of the Water System within the meaning of the Safe Drinking Water Act.

28.　　Defendant Andrea Hall Adebowale is sued in her official capacity as the Director of the Newark Department of Water and Sewer Utilities. She directs and supervises the day-to-day operations of the Water System. Defendant Hall Adebowale is an operator of the Water System within the meaning of the Safe Drinking Water Act.

29.     Defendant Catherine McCabe is sued in her official capacity as the Commissioner of NJDEP. She directs and supervises the day-to-day operations of NJDEP. EPA has delegated NJDEP to act as the primacy agency for the enforcement of the Safe Drinking Water Act in New Jersey. 44 Fed. Reg. 69,003 (Nov. 30, 1979). As Commissioner, Defendant McCabe has responsibility for overseeing NJDEP's compliance with the Safe Drinking Water Act and the Lead and Copper Rule.

## THE SAFE DRINKING WATER ACT

30.     The Safe Drinking Water Act, 42 U.S.C. §§ 300f–300j-27, is the federal law that protects the public from harmful contaminants in their drinking water.

31.     To achieve this goal, the Act requires owners and operators of public water systems to test their water for specified contaminants, treat the water to control for those contaminants, and provide certain reports and notices to customers and regulators, among other requirements. *See, e.g.*, *id.* § 300g-1; 40 C.F.R. §§ 141.80–141.91. Each of these steps is essential to reducing lead levels in tap water and informing the public about the health risks posed by their drinking water.

32.     The Act also requires public water systems to control for lead. The requirements for controlling lead in drinking water are set forth in the Lead and Copper Rule. 40 C.F.R. §§ 141.80–141.91.

33.     EPA is charged with issuing regulations to implement the Safe Drinking Water Act and with enforcing the Act's requirements if states fail to do so. 42 U.S.C. §§ 300g-2, 300g-3(a)(1). New Jersey has been delegated primary responsibility for ensuring that public water systems within the state comply with the Act's requirements. *See* 44 Fed.

Reg. at 69,003. NJDEP is responsible for enforcing the Safe Drinking Water Act in New Jersey. *Id.*

34.     EPA promulgated the Lead and Copper Rule in 1991. *See* 56 Fed. Reg. 26,460 (June 7, 1991). The Lead and Copper Rule includes requirements for public water systems to treat drinking water to control the leaching of lead from pipes and solder. *See* 40 C.F.R. § 141.80(b), (d).

35.     The standard set by the Lead and Copper Rule generally requires water systems to install and maintain optimal corrosion control to reduce corrosion of lead pipes and solder and the leaching of lead into drinking water. *Id.* § 141.81(d). Corrosion control treatment often involves adding chemicals to the water to reduce the water's corrosivity and control its effect on leaded pipes and solder. Corrosive water can corrode lead pipes, causing lead to leach into the water that is delivered to residents' taps.

36.     The Lead and Copper Rule requires water systems to take tap water samples to test the amount of lead in the water system. *Id.* § 141.86. The samples must be taken from sites that are a part of a pre-determined sampling pool. *Id.* § 141.86(a)(1). The sampling pool must consist of those homes that have the highest risk of lead contamination in their drinking water, called Tier 1 sampling sites, where sufficient Tier 1 sites are available. *Id.* § 141.86(a)(3)–(5).

37.     Tier 1 sampling sites are single family structures that either contain lead pipes, contain copper pipes with lead solder installed after 1982, or are served by a lead service line. *Id.* § 141.86(a)(3).

38.     Before beginning sampling, water systems must evaluate the materials within the system to identify a sampling pool that includes sufficient Tier 1 sites. *Id.* § 141.86(a)(1).

39.     Large water systems that serve more than 100,000 people, like Newark's system, must initially conduct tap water monitoring during two consecutive six-month monitoring periods each year. *Id.* §§ 141.86(c), (d)(1)(i). During each six-month period, large water systems serving more than 100,000 people must collect at least 100 samples from Tier 1 sampling sites, where sufficient Tier 1 sites are available. *Id.* § 141.86(c). Large water systems may reduce the frequency of sampling, and the number of samples collected, only after meeting certain criteria, and receiving approval from the state. *Id.* § 141.86(d)(4).

40.     Each time a water system completes a six-month monitoring period, it must calculate whether more than 10 percent of the samples collected have a lead concentration greater than 15 parts per billion. *See id.* §§ 141.80(c), 141.90(a)(1)(iv).

41.     When more than 10 percent of tap water samples collected by a water system exceed this 15 parts per billion threshold, known as the "lead action level," the water system must take additional steps to protect its customers from lead exposure. *Id.* §§ 141.84(a), 141.85–141.86; 56 Fed. Reg. at 26,478. These steps include identifying and reporting to the state the number of lead service lines in the water system, 40 C.F.R. § 141.90(e); replacing the system's infrastructure with pipes and solder that are "lead free" as defined by the Safe Drinking Water Act, *id.* §§ 141.43, 141.84; conducting additional monitoring of the system's source water to determine whether additional treatment is needed, *id.* §§ 141.83, 141.88(b); and conducting additional tap water monitoring, *id.* § 141.86(d)(4)(vi)(B).

42.     Water systems must notify customers of the individual results of tap water samples collected from their homes. *Id.* § 141.85(d)(1)–(2).

43.     Water systems that have a lead action level exceedance must offer to sample the tap water of any customer who requests sampling. *Id.* § 141.85(c).

44.     Water systems that have a lead action level exceedance must also educate the public about the risks of lead and ways consumers can reduce their exposure to lead in drinking water. *Id.* § 141.85(b).

45.     The Lead and Copper Rule requires water systems to report detailed information about their tap water monitoring to the state. *Id.* § 141.90.

## FACTS

<u>Harmful effects of lead</u>

46.     Lead can harm many of the body's functions and organs, and is particularly damaging to the nervous system.

47.     Young children are especially vulnerable to lead. Lead exposure in children can cause a wide array of problems, but is most harmful to a child's developing brain. Even low levels of lead exposure during childhood can result in reduced IQ scores, poorer academic performance, developmental delays, Attention Deficit and Hyperactivity Disorder, known as ADHD, and other behavioral problems and learning problems. Some of these effects are irreversible.

48.     Lead passes easily from a pregnant woman to her developing baby, which can cause premature birth, low birthweight, and damage to the baby's brain. Lead can also pass from nursing mothers to their babies through breast milk. Babies can also be exposed to lead if lead-contaminated water is used to mix baby formula. Infants who rely on formula may receive more than 85 percent of their exposure to lead from drinking water. 56 Fed. Reg. at 26,470.

49.     Even low levels of exposure to lead have been linked to damage to the central and peripheral nervous system, learning disabilities, shorter stature, impaired hearing, and impaired formation and function of blood cells.

50.     Exposure to lead also harms adults, including by causing nerve disorders, decreased kidney function, reproductive problems, and gastrointestinal damage. Adults exposed to lead may also suffer from muscle and joint pain, memory and concentration problems, and high blood pressure.

51.     After lead enters the bloodstream, it is distributed throughout the body, in a manner that is similar to iron and calcium. It settles in bones, where it interferes with the production of blood cells and the absorption of calcium. Calcium is necessary for muscle and nerve function, and for bone growth in children. Lead may remain stored in bones for years, where it can later be released into blood during times of physiological change, including stress, pregnancy, lactation, broken bones, and advanced age.

52.     Children and adults who have been exposed to lead may not immediately show symptoms. The effects of exposure may not appear for years, even long after measures of lead in blood have decreased.

53.     There is no identified safe level of lead in blood.

Lead in drinking water

54.     Water sources vary in their chemical properties. When water displays certain characteristics, including acidity, it is considered corrosive.

55.     Corrosive water causes metals to leach and/or flake from metallic pipes at a high rate. This can cause lead contained in pipes and the solder joining pipes to contaminate

drinking water in significant amounts. *See* 56 Fed. Reg. at 26,463–66. This leaching can continue indefinitely. *Id.* at 26,466.

56.     Lead often enters the water after it leaves the water system's treatment plant, as it travels through lead pipes towards consumers' homes. *Id.* at 26,471. Because lead enters the water after the water leaves the treatment plant, it cannot be removed at the plant, in the manner that other chemicals are removed from water. *Id.*

57.     The amount of lead that leaches into drinking water depends on the corrosivity of the source water. *Id.* at 26,466.

58.     Over the past several decades, drinking water has been identified as a significant source of lead exposure, as regulation has reduced the risk of lead exposure from other sources such as lead paint and leaded gasoline.

59.     There is no identified safe level of lead in drinking water.

<u>Newark's Water System</u>

60.     Newark's Water System provides drinking water to more than 290,000 residents, as well as to many people who work and go to school in Newark. The Water System has approximately 35,100 residential service connections, points where household and building plumbing connects to main water distribution pipes.

61.     According to the City, at least 15,000 of Newark's 35,100 residential service connections are connected to the main water distribution pipes by lead service lines. However, NJDEP has estimated that 22,100 of Newark's service connections rely on lead service lines.

62.     In March 2016, 30 schools within the Newark Public School district (Newark Public Schools) recorded lead levels above the 15 parts per billion action level. Newark

Public Schools receives water from the same Water System that provides drinking water to Newark homes and businesses.

63.    Many Newark schools disconnected from the City's Water System, shut off water fountains, and posted "do not drink" notices. Additionally, Newark Public Schools announced a plan to replace lead plumbing equipment and service lines for and/or install water filters on all water fountains with elevated levels of lead. According to its plan, after completing these and other steps, Newark Public Schools would reconnect the affected schools to the City water supply.

64.    Newark Public Schools received, and continues to receive, drinking water from the City of Newark. Newark Public Schools continues to report the presence of lead at levels as high as 15.4 parts per billion in accessible, non-decommissioned drinking water sources at certain schools, including elementary schools. Newark Public Schools reported much higher levels of lead—as high as 820 parts per billion—in water sources the district claims have been decommissioned.

65.    On September 11, 2015, NJDEP sent a letter to the Water System asking it to notify NJDEP if the Water System did not have a record of previously established Optimal Water Quality Parameters. On October 20, 2015, the Water System replied, stating that "we do not have any documentation of O[ptimal] W[ater] Q[uality] P[arameters] established by NJDEP."

66.    On July 12, 2016, NJDEP sent Defendant Hall Adebowale and Defendant Newark Department of Water and Sewer Utilities a letter indicating that NJDEP "is reevaluating the steps that have been taken to ensure that community water systems comply with the Lead and Copper Rule." As part of that reevaluation, NJDEP required Newark's

15

Water System to complete a 100-sample round of monitoring every six months, in accordance with the Lead and Copper Rule.

67.     In January 2017, the Water System began monitoring for lead on a six-month schedule. The first six-month monitoring period of 2017 continued from January 1 until June 30, 2017. During that time, at least 22 percent of the drinking water samples exceeded the 15 parts per billion federal action level, resulting in an action level exceedance under the Lead and Copper Rule. In that same period, 10 percent of the City's drinking water samples exceeded 27 parts per billion, with certain individual homes reaching much higher concentrations. At least six Newark homes tested above 50 parts per billion, and one tested at 127 parts per billion.

68.     On July 11, 2017, NJDEP issued a notice of non-compliance to Newark under the Lead and Copper Rule. Among other non-compliance, that notice states that between January and June 2017, Newark exceeded the 15 parts per billion federal action level of lead in drinking water. As a result of that action level exceedance, NJDEP required Newark to take certain steps to address the high lead levels.

69.     The July 2017 notice of non-compliance required Newark to submit a lead service line inventory within 60 days of the date of NJDEP's notice of non-compliance, by approximately September 11, 2017. Newark did not submit its lead service line inventory by that deadline. NJDEP has granted Newark at least one extension of the deadline to submit its lead service line inventory. On information and belief, Newark has still not submitted a complete lead service line inventory in accordance with NJDEP's instructions.

70.     The July 2017 notice of non-compliance required Newark to take additional steps to abate the lead in Newark's drinking water.

16

71.     Newark's water exceeded the lead action level again in the second monitoring period of 2017. Between July 1 and December 31, 2017, 10 percent of the Water System's samples exceeded 26.7 parts per billion, with 13 addresses above 30 parts per billion and 4 addresses above 50 parts per billion. At the close of the second monitoring period of 2017, more than 18 percent of the tap water samples exceeded 15 parts per billion.

72.     On January 23, 2018, NJDEP issued a second notice of non-compliance to Newark under the Lead and Copper Rule. The notice states that between July and December 2017, Newark again exceeded the 15 parts per billion federal action level for lead in drinking water. NJDEP required Newark to take certain steps to address the high lead levels, including many of the same steps that had already been required of Newark under the July 11, 2017, notice of non-compliance.

73.     Newark has continued to report high levels of lead in its tap water samples throughout the first monitoring period of 2018, which concludes June 30. Since January 1, 2018, over 10 percent of samples taken have exceeded the 15 parts per billion action level, with at least 6 samples exceeding 30 parts per billion, and a sample from one Newark residence containing levels as high as 182 parts per billion.

74.     In three successive triennial monitoring periods preceding the City's 2017 action level exceedances, Newark's self-reported lead levels reached 10, 9, and 11 parts per billion, respectively. Whether these previous samples were taken in accordance with the Lead and Copper Rule is not clear to Plaintiffs based upon information currently available to them.

17

75.     These high lead levels in Newark's drinking water are caused by Defendants' failure to comply with the Safe Drinking Water Act's and the Lead and Copper Rule's requirements.

76.     On April 27, 2018, Defendants City of Newark, Department of Water and Sewer Utilities, Mayor Baraka, and Director Adebowale made public statements assuring Newark residents that the water is safe to drink. In Newark's 2017 Water Quality Report, Defendants City of Newark, Department of Water and Sewer Utilities, and Mayor Baraka again stated that "the water is safe to use and drink" and that the "water is some of the best water in the State of New Jersey."

Requests for public records

77.     Pursuant to the New Jersey Open Public Records Act (OPRA), between August and October 2017, Plaintiff NRDC requested access from the City of Newark and the State of New Jersey to public records regarding the high lead levels in the City's drinking water.

78.     The records NRDC seeks would shed light on the severity of lead contamination in Newark's drinking water and the actions, if any, Newark has taken to address its non-compliance with the Safe Drinking Water Act and the Lead and Copper Rule.

79.     The City of Newark has provided limited records in response to NRDC's requests. Some of the records produced by the City of Newark form the basis of facts underlying the violations alleged in this complaint. However, Newark has failed to produce many of the public records requested in NRDC's OPRA requests.

80.     On April 24, 2018, NRDC filed a complaint and order to show cause in the Superior Court of New Jersey, Essex County, to obtain access to those requested public records. Compl., *Nat. Res. Def. Council v. City of Newark et al.*, No. ESX-L-002906-18 (N.J. Super. Ct. filed Apr. 24, 2018). In its answer, the City of Newark conceded that "documents remain outstanding and OPRA's deadline has been violated." Answer, *Nat. Res. Def. Council v. City of Newark et al.*, No. ESX-L-002906-18 (N.J. Super. Ct. June 1, 2018).

81.     After a hearing on June 22, 2018, the Honorable Judge Beacham found that the City of Newark had violated OPRA by failing to comply with statutory timelines, failing to produce responsive records, unlawfully redacting government records, and failing to state the specific bases for the unlawful withholdings. Court Order, *Nat. Res. Def. Council v. City of Newark et al.*, No. ESX-L-002906-18 (N.J. Super. Ct. June 25, 2018). The Court ordered the City to produce the requested records within 20 days. *Id.*

<u>The Water System is violating the Lead and Copper Rule's requirement to install optimal corrosion control treatment</u>

82.     The Lead and Copper Rule directed large water systems to identify and implement an "optimal" treatment program to reduce corrosion of lead pipes and solder by January 1, 1997. 40 C.F.R. § 141.81(d)(4).

83.     "[O]ptimal corrosion control treatment" is defined as the treatment that minimizes lead concentrations in consumers' tap water. *Id.* § 141.2. To adequately optimize corrosion control treatment, a system must minimize lead concentrations to the maximum extent feasible. *See id.*; 56 Fed. Reg. at 26,491.

84.     Corrosion control treatment often involves adding chemicals to the water to reduce its corrosivity and control its effect on leaded pipes and solder. Treatment chemicals, such as phosphates, inhibit corrosion. When corrosive water that is not treated with the

optimal mixture of corrosion inhibitor flows through leaded water pipes, the water can corrode the pipes, increasing the amount of lead that enters drinking water. Corrosive water can irreversibly damage water pipes.

85.     Newark receives its water from two sources. Water from the Pequannock Watershed in West Milford, New Jersey, is treated at the Pequannock Water Treatment Plant. The water leaving the Pequannock Water Treatment Plant must be treated with appropriate chemicals to control the corrosion of lead pipes into drinking water to the maximum extent feasible. Newark also receives water from the Wanaque Reservoir, which is treated at the Wanaque Water Treatment Plant. The water leaving the Wanaque Water Treatment Plant must be treated with appropriate chemicals to control the corrosion of lead pipes into drinking water to the maximum extent feasible.

86.     The Lead and Copper Rule required Newark to conduct initial monitoring and complete corrosion control studies in 1993 and 1994, respectively. 40 C.F.R. § 141.81(d)(1), (2). Using the information obtained through those initial monitoring and corrosion control studies, Newark was required to install optimal corrosion control treatment by January 1, 1997. *Id.* § 141.81(d)(4).

87.     NRDC has requested, but has not received, public records demonstrating that Newark completed the required initial monitoring, corrosion control studies, and installation of optimal corrosion control treatment. *See id.* § 141.81(d).

88.     On information and belief, the City of Newark has violated, and continues to violate, the Lead and Copper Rule's requirement to install optimal corrosion control treatment by January 1, 1997.

The Water System is violating the Lead and Copper Rule's requirement to maintain optimal corrosion control treatment

89.     The Lead and Copper Rule requires the Water System to "continue to operate and maintain optimal corrosion control treatment." *Id.* § 141.82(g).

90.     NRDC has requested, but has not received, public records demonstrating that Newark maintains optimal corrosion control treatment, as required under the Lead and Copper Rule. *See id.*

91.     In its two notices of non-compliance to the Department of Water and Sewer Utilities, NJDEP has determined that the "Newark Water Department is deemed to no longer have optimized corrosion control treatment."

92.     The Water System has not minimized the concentration of lead at users' taps, as required by the Lead and Copper Rule. *See id.* § 141.2 (definition of "[o]ptimal corrosion control treatment"). The high levels of lead in Newark's drinking water support the determination that Newark has failed, and continues to fail, to optimize corrosion control treatment.

93.     The failure to apply adequate corrosion control treatment has caused lead service lines and pipes within the City to corrode, and leach and/or flake off into drinking water.

94.     The Water System's failure to adequately treat the source water to optimally control corrosion has caused, and continues to cause, dangerous levels of lead to enter into the drinking water coming out of Newark residents' taps.

95.     The Water System has failed to adequately treat its source water with appropriate corrosion-inhibiting chemicals to minimize the amount of lead leaching from the Water System's pipes and solder.

96.     The Water System has violated, and continues to violate, the Lead and

Copper Rule's requirement to maintain optimal corrosion control treatment. *Id.*

§§ 141.80(d)(1), 141.82(g).

The Water System is violating the Lead and Copper Rule's requirement to evaluate the
materials within the Water System

97.     The Lead and Copper Rule requires Newark to perform a materials

evaluation before beginning monitoring for lead under the Lead and Copper Rule, by

January 1, 1992. *Id.* § 141.86(a), (d)(1).

98.     The materials evaluation must describe the "construction materials . . .

present in their distribution system," including the presence of "[l]ead from piping, solder,

caulking, interior lining of distribution mains, alloys and home plumbing . . . [c]opper from

piping and alloys, service lines, and home plumbing . . . [g]alvanized piping, service lines,

and home plumbing . . . [and f]errous piping materials such as cast iron and steel." *Id.*

§ 141.42(d); *see also id.* § 141.86(a)(2).

99.     The purpose of the materials evaluation is to identify a pool of targeted

sampling sites that is sufficiently large to ensure the Water System can collect the number

and type of samples required under the Lead and Copper Rule. *Id.* § 141.86(a)(1), (c).

100.    NRDC has requested, but has not received, public records demonstrating that

the Water System has completed a materials evaluation that meets the Lead and Copper

Rule's requirements.

101.    In response to NRDC's request for documentation of Newark's materials

evaluation, NJDEP stated that "materials evaluations and sampling plans were not

submitted [by the City] to NJDEP following the Lead and Copper Rule effective date."

102.    In response to NRDC's request for documentation of Newark's materials evaluation, the City initially declined to produce records showing that Newark had conducted a materials evaluation. On April 25, 2018, the day after receiving Plaintiffs' notice of intent to sue and NRDC's OPRA complaint, Newark reported to Plaintiffs that a materials evaluation did, in fact, exist and committed to producing that evaluation to Plaintiffs by April 27, 2018. Newark never produced the materials evaluation.

103.    In its motion to dismiss NRDC's OPRA complaint, Newark admitted that it does not have a materials evaluation. Defs.' Br. in Supp. of Mot. to Dismiss at 5, *Nat. Res. Def. Council v. City of Newark et al.*, No. ESX-L-002906-18 (N.J. Super. Ct. June 1, 2018). Subsequently, Newark stated it had completed a materials evaluation, but has not provided it to NRDC. Defs.' Reply in Supp. of Mot. to Dismiss at 2, *Nat. Res. Def. Council v. City of Newark et al.*, No. ESX-L-002906-18 (N.J. Super. Ct. June 13, 2018).

104.    On information and belief, the Water System has not completed the required materials evaluation.

<u>The Water System is violating the Lead and Copper Rule's monitoring requirements</u>

105.    The Lead and Copper Rule requires water systems to monitor for lead in household tap water. 40 C.F.R. § 141.86. Monitoring for lead at consumers' taps is necessary to measure lead levels in drinking water. This is because lead enters the water after it leaves the water system's treatment plant, as it travels through lead pipes towards consumers' homes.

106.    The Lead and Copper Rule's tap water monitoring requirements are designed to prioritize testing for lead in homes that are most at risk for elevated lead levels. Homes are at high risk if they contain lead plumbing, lead solder, or if they are served by lead

23

service lines. 56 Fed. Reg. at 26,514; *see* 40 C.F.R. § 141.86(a)(3). Service lines are pipes that connect household plumbing to the main water distribution pipe in the street. In older water distribution systems, such as Newark's Water System, these service lines often are made of lead.

107.    Monitoring at high-risk homes is critical to ensuring that elevated lead levels in drinking water are detected, because lead is not distributed uniformly throughout a water system. 56 Fed. Reg. at 26,514. Instead, lead can dissolve or small lead pieces may flake and break away from a lead service line and travel into a customer's home without spreading evenly throughout the water in the distribution system. These lead pieces can result in intermittent but large spikes in the water's lead levels. Even a single sample showing elevated levels of lead indicates that these dangerous lead pieces may be present more widely in the system.

108.    Targeting high-risk homes thus makes it more likely that a water system will detect whether lead is flaking off or leaching from the water system's pipes or solder. Such targeting also helps water systems and regulators determine whether a system has minimized lead levels in drinking water by operating an optimized corrosion control treatment program. *Id.*

109.    Before a water system begins monitoring for lead at household taps, it must identify a pool of targeted sampling sites. 40 C.F.R. § 141.86(a)(1). The sampling pool must consist of Tier 1 sites, which are homes that have a high risk of lead contamination, to the extent sufficient Tier 1 sites are available. *See id.* § 141.86(a)(3)–(8).

110.    Newark was required to collect a set of at least 100 tap water samples twice each year. *Id.* § 141.86(c), (d)(1). Newark has sufficient Tier 1 sites to fill its entire sampling

24

pool with Tier 1 sites. Therefore, Newark was required to take each of these 100 samples from a Tier 1 sampling site. *See id.* § 141.86(a)(3)–(4).

111.    During the first six-month monitoring period of 2017, Newark had 131 Tier 1 sites within its sampling pool, but it collected samples from only 40 Tier 1 sites. During the second six-month monitoring period of 2017, Newark collected samples from 88 Tier 1 sites. In both monitoring periods of 2017, Newark filled its 100-sample quota with sites that are not Tier 1 sampling sites, and thus are less likely to show lead contamination.

112.    As of the filing date, Newark has failed to meet the Lead and Copper Rule's requirement to take 100 tap water samples from Tier 1 sites during the first monitoring period of 2018.

113.    Over the course of the last three six-month monitoring periods, Newark has obscured the severity of its lead problem by filling its 100-sample quota with sites that are less likely to show elevated lead levels. This ongoing dilution of sampling results with lower priority sites that are less likely to have elevated lead levels suggests that the City has routinely underestimated its lead levels, and will continue to do so in the future.

The Water System is violating the Lead and Copper Rule's requirement to complete public education

114.     The Lead and Copper Rule requires water systems to notify each "bill paying customer[]" with printed materials containing specified language when a water system exceeds the lead action level during a monitoring period. *Id.* § 141.85.

115.    These public education materials must include specific information about the health effects of lead, provide guidance on protecting against lead exposure, and advise customers how to get their tap water tested for lead, among other requirements. *Id.* § 141.85(a)(1).

25

116.    Correspondence between the City and NJDEP shows that Newark failed to notify at least 200, and as many as 20,000, service account holders about its July 2017 action level exceedance, in violation of the Lead and Copper Rule.

117.    The City of Newark has failed and, on information and belief, is continuing to fail, to meet the Lead and Copper Rule's requirement to provide the required public education materials to all bill paying customers. *See id.* § 141.85.

The Commissioner of NJDEP is violating the Lead and Copper Rule's requirement to designate optimal corrosion control treatment

118.    Under the Lead and Copper Rule, NJDEP was required to "either approve the corrosion control treatment option recommended by the system, or designate alternative corrosion control treatment(s)" by January 1, 1995. *Id.* §§ 141.81(d)(3), 141.82(d)(1).

119.     NJDEP was required to provide notice of its decision on optimal corrosion control treatment in writing and explain the basis for its determination. *Id.* § 141.82(d)(2).

120.    NJDEP does not have any records documenting its designation of optimal corrosion control treatment for the Water System. On information and belief, NJDEP has not designated optimal corrosion control treatment for the Water System.

121.    On information and belief, Catherine McCabe, acting in her official capacity as the Commissioner of NJDEP, is in violation of her obligation to designate optimal corrosion control treatment for the Water System.

The Commissioner of NJDEP is violating the Lead and Copper Rule's requirement to designate optimal water quality parameters

122.    The Lead and Copper Rule required NJDEP to designate optimal water quality parameters for Newark by July 1, 1998. *Id.* § 141.81(d)(6).

123.    NJDEP is required to review all water samples submitted by the Water System and "designate . . . water quality control parameters . . . that the State determines to reflect optimal corrosion control treatment for the system." *Id.* § 141.82(f).

124.    NJDEP was required to notify the Water System "in writing of these determinations and explain the basis for its decisions." *Id.*

125.    NJDEP's obligation to designate optimal water quality parameters for the Water System is ongoing. It exists "both before and after the system installs optimal corrosion control treatment." *Id.*

126.    NJDEP does not have any records documenting its designation of optimal water quality parameters for the City of Newark. The City of Newark has informed NJDEP that it does not have any documentation of optimal water quality parameters established by NJDEP. On information and belief, NJDEP as not designated optimal water quality parameters for the Water System.

127.    On information and belief, Catherine McCabe, acting in her official capacity as the Commissioner of NJDEP, is in violation of her obligation to designate water quality parameters for the Water System.

Notice of intent to sue under the Safe Drinking Water Act

128.    On April 24, 2018, Plaintiffs submitted a notice of intent to sue describing the claims alleged herein. *See* 42 U.S.C. § 300j-8(b). Plaintiffs contacted all Defendants on May 1, 2018 to request a meeting to discuss the notice of intent to sue, but did not receive a response from any Defendant.

129.    On June 12, 2018, Plaintiffs again contacted Defendants to request a meeting to discuss the notice of intent to sue. A representative of Defendants City of Newark,

Newark Department of Water and Sewer Utilities, Mayor Ras Baraka, and Director Andrea Adebowale indicated that a written response to Plaintiffs' notice of intent to sue would be provided before the close of the notice period. Plaintiffs did not receive a written response to the notice of intent to sue from Defendants City of Newark, Newark Department of Water and Sewer Utilities, Mayor Ras Baraka, or Director Andrea Adebowale.

130.     On June 21, 2018, Plaintiffs and representatives of Defendant Catherine McCabe, Commissioner of NJDEP, participated in a telephone conference regarding Plaintiffs' notice of intent to sue. On June 25, 2018, after the close of the 60-day notice period, Plaintiffs received a letter, submitted on behalf of NJDEP, which summarily states that "the requirements in the [L]ead and [C]opper [R]ule triggered by Newark's lead action level exceedances have been met." NJDEP's letter does not, however, provide sufficient evidence to establish that the Water System and NJDEP are not continuing to violate the Lead and Copper Rule, as alleged in Plaintiffs' notice of intent to sue and this pleading.

### FIRST CLAIM FOR RELIEF
**(Violation of the Safe Drinking Water Act's requirement to complete a materials evaluation, 40 C.F.R. §§ 141.86, 141.42)**

131.     Plaintiffs incorporate by reference all of the preceding paragraphs.

132.     Defendants City of Newark; Newark Department of Water and Sewer Utilities; Newark Mayor Ras Baraka, acting in his official capacity; and Newark Department of Water and Sewer Utilities Director Andrea Hall Adebowale, acting in her official capacity, have violated and continue to violate the Safe Drinking Water Act and its implementing regulations by failing to perform a materials evaluation. 40 C.F.R. §§ 141.86, 141.42(d).

## SECOND CLAIM FOR RELIEF
### (Violation of the Safe Drinking Water Act's requirements for monitoring tap water for lead, 40 C.F.R. § 141.86)

133.    Plaintiffs incorporate by reference all of the preceding paragraphs.

134.    Defendants City of Newark; Newark Department of Water and Sewer Utilities; Newark Mayor Ras Baraka, acting in his official capacity; and Newark Department of Water and Sewer Utilities Director Andrea Hall Adebowale, acting in her official capacity, have violated and continue to violate the Safe Drinking Water Act and its implementing regulations by failing to comply with the Act's requirements to sample sufficient Tier 1 sites that are most likely to have the highest lead concentrations. 40 C.F.R. § 141.86(a)(3).

## THIRD CLAIM FOR RELIEF
### (Violation of the Safe Drinking Water Act's requirement to install optimal corrosion control treatment, 40 C.F.R. §§ 141.80, 141.81)

135.    Plaintiffs incorporate by reference all of the preceding paragraphs.

136.    Defendants City of Newark; Newark Department of Water and Sewer Utilities; Newark Mayor Ras Baraka, acting in his official capacity; and Newark Department of Water and Sewer Utilities Director Andrea Hall Adebowale, acting in her official capacity, have violated and continue to violate the Safe Drinking Water Act and its implementing regulations by failing to comply with the Act's requirements to install optimal corrosion control treatment by January 1, 1997. 40 C.F.R. §§ 141.80(d)(1), 141.81(d)(4).

## FOURTH CLAIM FOR RELIEF
### (Violation of the Safe Drinking Water Act's requirement to operate and maintain optimal corrosion control treatment, 40 C.F.R. §§ 141.81, 141.82)

137.    Plaintiffs incorporate by reference all of the preceding paragraphs.

138.    Defendants City of Newark; Newark Department of Water and Sewer Utilities; Newark Mayor Ras Baraka, acting in his official capacity; and Newark Department of Water and Sewer Utilities Director Andrea Hall Adebowale, acting in her official capacity, have violated and continue to violate the Safe Drinking Water Act and its implementing regulations by failing to operate and maintain optimal corrosion control treatment. 40 C.F.R. §§ 141.81, 141.82(g).

## FIFTH CLAIM FOR RELIEF
**(Violation of the Safe Drinking Water Act's requirement to complete public education, 40 C.F.R. § 141.85)**

139.    Plaintiffs incorporate by reference all of the preceding paragraphs.

140.    Defendants City of Newark; Newark Department of Water and Sewer Utilities; Newark Mayor Ras Baraka, acting in his official capacity; and Newark Department of Water and Sewer Utilities Director Andrea Hall Adebowale, acting in her official capacity, have violated and continue to violate the Safe Drinking Water Act and its implementing regulations by failing to provide public education materials to each bill paying customer. 40 C.F.R. § 141.85.

## SIXTH CLAIM FOR RELIEF
**(Violation of the Safe Drinking Water Act's requirement to designate corrosion control treatment, 40 C.F.R. §§ 141.81, 141.82)**

141.    Plaintiffs incorporate by reference all of the preceding paragraphs.

142.    Defendant Catherine McCabe, acting in her official capacity as Commissioner of NJDEP, has violated and continues to violate the Safe Drinking Water Act and its implementing regulations by failing to designate corrosion control treatment for the City of Newark by January 1, 1995. 40 C.F.R. §§ 141.81(d)(3), 141.82(d)(1).

## SEVENTH CLAIM FOR RELIEF
### (Violation of the Safe Drinking Water Act's requirement to designate optimal water quality parameters, 40 C.F.R. §§ 141.81, 141.82)

143.    Plaintiffs incorporate by reference all of the preceding paragraphs.

144.    Defendant Catherine McCabe, acting in her official capacity as Commissioner of NJDEP, has violated and continues to violate the Safe Drinking Water Act and its implementing regulations by failing to designate optimal water quality parameters for the City of Newark. 40 C.F.R. §§ 141.81(d)(6), 141.82(f).

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment against Defendants as follows:

A.    Declaring that all Defendants are in violation of their obligations under the Safe Drinking Water Act and its implementing regulations;

B.    Enjoining all Defendants from ongoing and future violations of the Safe Drinking Water Act and its implementing regulations, including but not limited to the treatment, monitoring, reporting, and notification requirements of the Lead and Copper Rule;

C.    Ordering that Defendants take all such actions as may be necessary, and all such actions as the Court may deem appropriate, to remedy these violations, comply with the Safe Drinking Water Act and its implementing regulations, and mitigate the harm caused by Defendants' violations of the Lead and Copper Rule's treatment, monitoring, reporting, and notification requirements;

D.    Ordering that Defendants promptly complete full replacement of all lead service lines in the Water System at no cost to customers of the Water System, including replacement of those portions of the lead service lines that are located under private

property, unless the Water System is unable, after making reasonable efforts, to

obtain permission from the owner of the property after notifying the owner and

offering to replace the owner's portion of the line at the Water System's expense;

E.  Granting appropriate equitable relief to mitigate the health and medical risks and

harm resulting from Defendants' violations;

F.  Awarding Plaintiffs their reasonable costs and attorneys' fees; and

G.  Granting such other and further relief as the Court deems just and proper.


Dated: June 26, 2018                    */s Sara E. Imperiale*
                                        Sara E. Imperiale, SBN # 077832013
                                        Natural Resources Defense Council, Inc.
                                        40 W 20th Street, Fl. 11
                                        New York, New York 10011
                                        Tel: 212-727-2700


                                        Claire Woods, PHV application forthcoming
                                        Natural Resources Defense Council, Inc.
                                        111 Sutter Street, Fl. 21
                                        San Francisco, California 94104
                                        Tel: 415-875-6143